UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RICHARD STOVER,**

    **Plaintiff,**

  v.

**CAREFACTOR,** *et al.***,**

    **Defendant.**

:

:

**Case No. 2:22-cv-1789**
**Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Richard Stover filed this ERISA action after he was denied medical benefits under his employer-sponsored health plan, the Gutridge Health Benefits Plan. The action is against CareFactor (the Plan's third-party claims administrator) and KE Gutridge (the Plan's sponsor and administrator). (FAC, ECF No. 28.) The Administrative Record was filed under seal. (Admin. R. Pt. 1, ECF No. 29; Admin. R. Pt. 2, ECF No. 44.) CareFactor and KE Gutridge now move for judgment. (ECF No. 45; ECF No. 47 (redacted); ECF No. 49 (sealed).) Mr. Stover responded (ECF Nos. 50, 52-1) and each Defendant replied (ECF Nos. 61, 62).

Because Mr. Stover has proven by a preponderance of the evidence that he was entitled to Plan benefits, Defendants' motions are **DENIED** and judgment will be entered in Mr. Stover's favor.

I.     FACTUAL BACKGROUND

   A.    **March 27, 2021: Mr. Stover suffers a broken ankle after being kicked by a bull.**

Mr. Stover was employed by KE Gutridge as an HVAC Division Manager. (*See* Admin. R. Pt. 1, PAGEID # 654.) He also lived on a working cattle farm and sold freezer beef under the trade name Buckeye Country Angus. (*See* Admin. R. Pt. 2, PAGEID # 1029.) On March 27, 2021, Mr. Stover was kicked in the leg by a bull calf. (*Id.*, PAGEID # 1032.) The kick resulted in a closed trimalleolar fracture of his left ankle and dislocation of the left ankle joint. (Admin. R. Pt. 1, PAGEID # 338.) The injury required surgery and a short hospital stay. (*See id.*, PAGEID # 548.)

   B.    **April 2021: Mr. Stover makes a claim for Plan benefits.**

In early-April, Mr. Stover made a claim for coverage under the Plan.[1] (FAC, ¶ 21.) The claim was initially denied for failure to comply with the Plan's pre-certification procedures. (Admin. R. Pt. 1, PAGEID # 551.) But, on April 30, CareFactor began to discuss another reason to deny the claim. Matthew Riehl (CareFactor's Vice President, Operations & Strategic Partnerships) emailed Bobby Handley (CareFactor's Vice President, General Counsel & Secretary):

> Bobby,
>
> Need some assistance. The accident form[2] pertaining to claim number 059224466 is attached. It states that the insured (Richard Stover) was "kicked in the lower left/ankle leg by a bull calf".
>
> There is a business registered to Richard Stover (info below) at the same address as the accident – Buckeye Country Angus.

---

[1] The Administrative Record does not include a copy of the initial claim.
[2] The Administrative Record does not include a copy of the accident form.

2

> Can you review the [Plan Document and Summary Plan Description] an [*sic*] provide guidance on if this is covered by the Gutridge plan. . . .

Mr. Handley responded:

> There is a [*sic*] exclusion for occupational injury.
>
> > **(28) Occupational.** Care and treatment of an Injury or Sickness that is occupational – that is, arises from work for wage or profit including self-employment.

(*Id.*, PAGEID # 550.)

### C. May 24, 2021: CareFactor and ALLOY Employer Services decide to deny the claim as Occupational.

On May 24, John R. Pine, CEO of ALLOY Employer Services (KE Gutridge's broker), requested a call with CareFactor to discuss "concerning" claims, including Mr. Stover's. (*Id.*, PAGEID # 554; *see also* ECF No. 62, PAGIED # 1339.) Mr. Pine followed an apparent call with an email to CareFactor employees Roger Munday, Matthew Riehl, and Bob Ochall:

> Roger,
>
> Thanks for the call just now. I appreciate your insight.
>
> On the Stover claim, just to confirm, this was the result of working a second job in a separate corporation. Denial is the outcome and has been discussed with both Matt and Bob.
>
> Having this claim appear to be open is a detriment to the IBNR as you know, and we appreciate the fact that you responded so quickly.
>
> Best, J.R.

(Admin. R. Pt. 1, PAGEID # 553.)

3

### D. June 2021: Mr. Stover tells CareFactor that the bull was for personal consumption.

On June 9, the Plan's subrogation counsel, Bryan Davenport, advised CareFactor that his office was "able to determine that Richard Stover is the owner of Buckeye Country Angus, which sells freezer beef." (Admin. R. Pt. 2, PAGEID # 1034.) Attorney Davenport "believe[d] [Mr. Stover] was injured while working the farm and this should either be turned into his Farm Ins[urance] or considered a [Workers Compensation] related injury." (*Id.*)

The following week, Mr. Stover submitted a revised claim form. (*Id.*, PAGEID # 1032.) Mr. Stover described the cause of his injury this way:

> I was working with a bull calf that we were raising to eat for our family. The bull calf kicked me in the left ankle.

(*Id.*) Attorney Davenport told CareFactor that "with this new information," there would be "no source of recovery" on a subrogation claim. (*Id.*, PAGEID # 1033.) He further advised it was "ok to process claims from a subrogation standpoint." (*Id.*)

### E. June 21, 2021: CareFactor and ALLOY Employer Services decide to deny the claim as work-related.

On Friday, June 18, Kelly Davis (CareFactor's Manager, Implementation & Operations) emailed Mr. Riehl, letting him know that Mr. Stover now said the bull that kicked him was for personal consumption, and not for sale. (Admin. R. Pt. 1, PAGEID # 558.) On Monday, June 21, Mr. Riehl responded:

> Kelly,
>
> Please deny the claim(s) for Richard Stover related to his accident with the 'bull calf.' The denial is for no coverage.
>
> The broker is aware.

4

Let me know if you have any questions.

Thanks,

(*Id.*)

Mr. Stover was then notified that his medical claims were denied under the Plan's Occupational exclusion. (*See, e.g., id.*, PAGEID # 562–80.)

### F. July 12, 2021: Mr. Stover appeals, submitting additional information and documents.

On July 12, 2021, Mr. Stover appealed the denial of coverage. (*Id.*, PAGEID # 582–83.) The appeal letter argued that the "determination that Mr. Stover's injuries were 'work related'" was "inaccurate" and "made without sufficient supporting evidence or documentation[.]" (*Id.*, PAGEID # 583.)

Attorney Davenport responded, noting that the Plan had now retained him to "address" the appeal letter. (*Id.*, PAGEID # 595.) Attorney Davenport made fifteen information requests. Those requests, and Mr. Stover's responses, are below:

1. Is there a business that goes by the name of Buckeye Country Angus located at 22742 Raymond Road, Raymond, OH 43067? **Yes**

2. Does that business market, and sell beef cattle, or beef cattle products? **Yes**

3. On March 27th, 2021 was Mr. Stover kicked by a bull while weaning cattle at Buckeye Country Angus? **No. Mr. Stover was weaning a bull calf that he owned personally and was separating it to feed it to eat it personally.**

4. Does Buckeye County Angus fill federal or state tax forms? If it does, please provide a copy of the 2020 tax forms for Buckeye Country Angus. **No, it's ran through our personal tax filing.**

5. Does either Richard or Tracy Stover receive, or derive, any income or other benefit, from Buckeye Country Angus? **Yes**

5

6. Does Buckeye County Angus maintain a set of books, and records, documenting the income and expenses of the operation? **Yes**

7. Does Buckeye County Angus maintain a separate bank account for the deposit of income and the payment of expenses? **Yes**

8. Who is the person that is primarily responsible for the day-to-day operations of Buckeye Country Angus? **Tracy Stover Richard Stover**

9. On March 27th, 2021 Richard Stover was weaning cattle at the time of his ankle injury where said cattle the property of Buckeye Country Angus? **No, it was a personally owned bull calf of Richard Stover's**

10. Were any of the cattle Mr. Stover was weaning eventually sold by Buckeye Country Angus, or in the alternative will any of the cattle Mr. Stover was weaning eventually be sold by Buckeye Country Angus? **No**

11. Does Richard Stover participate in the operations of Buckeye Country Angus? **Yes**

12. How many cattle are routinely fed by Buckeye Country Angus? How many cattle were being fed by Buckeye Country Angus on 03/27/2021? **Between 5 to 10**

13. Is weaning cattle a part of the business conduct of Buckeye Country Angus? **Yes**

14. Please provide the name and for every individual who has knowledge regarding Mr. Richard Stover's injury of 03/27/2021. **Tracy Stover [*phone number omitted*] Tory Stover [*phone number omitted*]**

15. How many individuals work with or for Buckeye Country Angus? Please provide their names and titles. **Richard Stover – Owner Tracy Stover – Owner Tory Stover – Son**

(*Id.*, PAGEID # 595–96 (reproduced as written except where indicated).)

After reviewing Mr. Stover's statements, Attorney Davenport responded and advised (via email with Mr. Handley copied) that "without further documentation establishing that the costs of the personal cow were separately paid for and accounted for apart from the 'business' cows,' the [Plan] intended to maintain its denial." (*Id.*, PAGEID # 598.)

6

Mr. Stover then provided (i) a March 1, 2021 invoice from Corner Stone Genetics for a single bull calf costing $500 and (ii) a February 16, 2021 receipt from Delaware Meats reflecting $445 in beef butchering costs. (*Id.*, PAGEID # 605–06.) He explained (through his attorney) that:

- Dan Hutchins (Corner Stone Genetics' proprietor) "knows that we keep our personal beef separated from the Buckeye Country Angus Cattle;"

- His family has raised their own beef since 1984; and

- His family separately accounts for their personal beef, as evidenced by the "example of us paying for the processing of a personal beef to Delaware Meats" paid by personal check card.

(*Id.*, PAGEID # 602–03.) Attorney Davenport forwarded the additional information and documents to Mr. Handley within two hours of receipt. (*Id.*, PAGEID # 601.)

### G. September 28, 2021: CareFactor and ALLOY Employer Services decide to deny the appeal.

Three weeks later, on September 28, 2021, Mr. Riehl emailed Mr. Pine, copying Mr. Handley, to summarize a conversation from earlier that day:

> JR,
>
> Thank you for your time this morning.
>
> As we discussed this morning, CareFactor will continue to deny the claims related to the Richard Stover "bull calf" accident until further notice from Gutridge or you. Currently, the claim charges are approximately $84,435.14 after network discount.
>
> Bobby Handley will be contacting our subrogation counsel and updating you with the details after the call.
>
> Thanks again and talk with you soon.

(*Id.*, PAGEID # 643.)

Two days later, CareFactor issued a "Notice of <u>Final</u> Adverse Benefit Determination" advising Mr. Stover that his claims were "denied as a work related claim not covered" under the Plan, citing the Occupational exclusion. (*Id.*, PAGEID # 644.)

This lawsuit followed. (ECF No. 1.)

## II. RELEVANT PLAN TERMS

It is "a fundamental principle of ERISA law—the plain language of the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). Accordingly, the Court's "starting point is the language of the Plan itself." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).

### A. General

The Gutridge Health Benefits Plan was established and maintained to protect KE Gutridge employees and their dependents "against certain catastrophic health expenses." (Plan, PAGEID # 703, 735, 739.) The Plan is self-funded, meaning that benefits are paid out of KE Gutridge's general funds. (*Id.*, PAGEID # 772.) The Plan generally covers hospitalization and surgery at 80%, after the deductible has been satisfied. (*See id.*, PAGEID # 707–08.) The coverage is, however, subject to several enumerated exclusions. (*See, e.g., id.*, PAGEID # 704.) Among other things, the Plan excludes coverage for the "[c]are and treatment of an Injury or Sickness that is occupational – that is, arises from work for wage or profit including self-employment." (*Id.*, PAGEID # 742.)

8

### B. Plan Administrator

KE Gutridge is the Plan Administrator and Plan Sponsor. (*Id.*, PAGEID # 766.) Per its terms,

> [the Plan] is to be administered by the Plan Administrator in accordance with the provisions of ERISA. An individual or committee may be appointed by KEGutridge to be Plan Administrator and serve at the convenience of the Employer. If the Plan Administrator or a committee member resigns, dies or is otherwise removed from the position, KEGutridge shall appoint a new Plan Administrator as soon as reasonably possible.
>
> The Plan Administrator shall administer this Plan in accordance with its terms and establish its policies, interpretations, practices, and procedures. It is the express intent of this Plan that the Plan Administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan. The decisions of the Plan Administrator will be final and binding on all interested parties.

(*Id.*) The Plan Administrator is further charged:

> (1) To administer the Plan in accordance with its terms.
>
> (2) To interpret the Plan, including the right to remedy possible ambiguities, inconsistencies or omissions.
>
> (3) To decide disputes which may arise relative to a Plan Participant's rights.
>
> (4) To prescribe procedures for filing a claim for benefits and to review claim denials.
>
> (5) To keep and maintain the Plan documents and all other records pertaining to the Plan.
>
> (6) To appoint a Claims Administrator to pay claims.
>
> (7) To perform all necessary reporting as required by ERISA.

9

    (8) To establish and communicate procedures to determine whether a medical child support order is qualified under ERISA Sec. 609.

    (9) To delegate to any person or entity such powers, duties and responsibilities as it deems appropriate.

(*Id.*)

### C. Claims Administrator

CareFactor is the Plan's third-party Claims Administrator. (*Id.*, PAGEID # 772.) The Claims Administrator is tasked with processing and paying claims for Plan benefits. (*See, e.g., id.*, PAGEID # 769.) That is done, however, in accordance with the Plan Administrator's rules and instructions. (*Id.*, PAGEID # 767.) The Plan provides that the "Claims Administrator is **not** a fiduciary under the Plan by virtue of paying claims in accordance with the Plan's rules as established by the Plan Administrator." (*Id.* (emphasis in original).)

### D. Claims and Appeals

In the event a participant disagrees with an adverse benefit determination made by the Claims Administrator, he can appeal to the Plan Sponsor. (*Id.*, PAGEID # 749.) The Plan promises "a full and fair review" of each appeal "on an unbiased basis." (*Id.*) Further, "[a]ny individual involved in the initial determination may not participate in an appeal of the initial determination." (*Id.*)

## III. STANDARD OF REVIEW

ERISA benefit determinations are reviewed *de novo* unless the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Yaeger v. Reliance Std. Life*

*Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). If a plan grants discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger*, 88 F.3d at 380. If it does not grant discretionary authority, a court reviews the evidence in the administrative record *de novo*. Likewise, if the benefits determination was made by a party other than one to which the plan grants discretionary authority, *de novo* review is appropriate. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir.2001). In such case, the plaintiff must prove by a preponderance of evidence that he is entitled to receive the benefit. *Javery v. Lucent Tech., Inc. Long Term Disability Plan*, 741 F.3d 686, 700–01 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006)).

The parties here disagree about the appropriate standard of review. Defendants argue for the deferential arbitrary and capricious standard. (*See* ECF No. 45-1, PAGEID # 1076; ECF No. 49, PAGEID # 1121.) Both note that the Plan gives discretionary authority to the Plan Administrator. But Mr. Stover disputes that his benefit determination was made by the Plan Administrator. (*See, e.g.*, ECF No. 50, PAGEID # 1151.) As a result, he asserts that the determination is subject to *de novo* review.

Mr. Stover makes a good point. KE Gutridge is noticeably absent from the Factual Background. And that is a direct reflection of the company's absence from the Administrative Record. Although KE Gutridge now represents that it "was the sole decision maker regarding [Mr. Stover's] eligibility for benefits," the record

11

shows that his claim and his appeal were considered, discussed, analyzed, and decided by CareFactor and ALLOY Employer Services.[3]

The record reveals very little about ALLOY. Its CEO, Mr. Pine, signed the Plan document and the Claims Administration Services Agreement as "Power of Attorney" for KE Gutridge. (*See* Admin. R. Pt. 1, PAGEID # 326; Admin. R. Pt. 2, PAGEID # 773.) But nothing in the record further illuminates the relationship between KE Gutridge and ALLOY. There is no corporate resolution, Plan amendment, committee charter, delegation, or any other governing or authoritative document that would allow the Court to conclude that ALLOY's decision was that of the Plan Administrator. The Court will thus proceed with *de novo* review. *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365–66 (6th Cir. 2009)

## IV. ANALYSIS

Mr. Stover argues that the denial of his claim for Plan benefits was in error. He cites two reasons: first, that medical necessity is the only valid reason to deny pre-certified claims under the Plan; and second, that Defendants failed to shoulder the burden of proving that a coverage exclusion applied. Because the second argument is well-taken, the Court need not address the first.

---

[3] This finding defeats CareFactor's argument that it is not a proper party to this action. *See Ciaramitaro v. Unum Life Ins. Co. of Am.*, 521 F. App'x 430, 438 (6th Cir. 2013) (clarifying that an entity may be a defendant in an ERISA denial-of-benefits action if it "played any role in controlling or influencing [the plaintiff's] benefits decision"); *see also* ECF No. 17.

No one disputes that the medical care Mr. Stover received after the March 27, 2021 accident was of a type that would be covered under the Plan. The dispute is whether the Occupational exclusion prevents the Plan from covering that care. "When an ERISA plan relies on an exclusion to deny benefits, . . . the plan (not the employee) has the burden of proving that the exclusion applies." *Foltz v. Barnhart Crane & Rigging, Inc.*, 636 F. App'x 677, 680–81 (6th Cir. 2016) (citing *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005)). The Plan has not shouldered that burden.

> **A. Mr. Stover offered sufficient evidence to perfect his claim for Plan benefits.**

From the time it became clear that the bull's purpose was relevant to his medical claims, Mr. Stover has consistently asserted that he was kicked by a bull calf being raised for personal consumption.[4] Mr. Stover provided statements to support his version of events, along with the names and phone numbers of three other individuals with knowledge of his family's commercial and personal use of

---

[4] Defendants argue that Mr. Stover admitted that he was working when he was injured. (*See* ECF No. 45-1, PAGEID # 1080 ("Stover's own admissions during medical care establish he was working for his commercial farm when he was kicked."); ECF No. 49, PAGEID # 1123 (". . . Plaintiff admitted that he was injured while working at the farm[.]").) They point to hospital treatment records from when Mr. Stover presented for care. (*See* Admin. R. Pt. 2, PAGEID # 801, 1047.) The records—prepared by medical providers and not reviewed by Mr. Stover for completeness or accuracy—are poor proof of an admission. What's more, they are inconsistent about the source of his injury. (*Compare* Admin. R. Pt. 1, PAGEID # 339 ("Pt was at work working w/ a bull and was kicked to left ankle.") *and* PAGEID # 371 ("He was kicked by a bull at home earlier.").)

13

their home as a cattle farm.[5] He also offered documents that reflect a practice of raising and slaughtering livestock in personal-use quantities: (i) a receipt for a single head of cattle from a local breeder three weeks before his accident; and (ii) a receipt showing that his wife had recently used their personal check card to process a few hundred dollars-worth of beef at a local butcher.[6] Though perhaps not the smoking gun the Plan hoped to receive from Mr. Stover, this was enough to perfect his claim for Plan benefits.

### B. The Plan did not prove that the Occupational exclusion applies.

The Administrative Record does not reflect that the Plan met its burden to prove that the Occupational exclusion applied to Mr. Stover's claim. Defendants first shrugged off evidence that the bull calf was for personal consumption—affording the hospital records' references to a farm greater weight than Mr. Stover's statements, ignoring subrogation counsel's conclusion that there was no other source of recovery for an injury sustained by a personal bull, and putting myopic focus on the date of the Delaware Meats receipt at the expense of seeing its evidentiary significance. Next, they failed to develop any evidence to the contrary—

---

[5] Mr. Stover admits that he owns and operates Buckeye Country Angus. But Buckeye Country Angus is not an incorporated entity—it is a trade name registered to the Stover family's home address in Raymond, Ohio.

[6] Attorney Davenport noted "that the bill for butchering the beef is dated a full month before the accident." (Admin. R. Pt. 2, PAGEID # 645.) As a result, he was "not at all clear how that receipt addresses the issue at hand." (*Id.*) But the receipt was never intended to prove that the bull that kicked Mr. Stover was slaughtered at Delaware Meats. Instead (as Mr. Stover's attorney explained to Attorney Davenport), the receipt was simply an example of the family's practice of separately processing personal beef using personal funds. (*See* Admin. R. Pt. 1, PAGEID # 603.) Viewed as such, the receipt's relevance is quite clear.

14

for example, there is no indication that anyone spoke with Dan Hutchins, who sold Mr. Stover the single bull calf, or with Tracy or Tory Stover, whom Mr. Stover disclosed as having knowledge of the injury.

Instead, those involved in the benefit determination found that Mr. Stover does sell some beef and chose not to believe him when he said that this beef was different.

### C. Remand is not the appropriate remedy.

"In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Met. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). Remand is particularly appropriate "where the plan administrator's decision suffers from a procedural defect or the administrative record is factually incomplete." *Majestic Star*, 581 F.3d at 373. But "where there was no evidence in the record to support a termination or denial of benefits, an award of benefits is appropriate without remand to the plan administrator." *Id.* (internal quotation, citation, and alteration omitted). Here, the most appropriate remedy is to award benefits to Mr. Stover. Remand would serve no purpose outside of affording the Plan a second bite at the apple. *Cf. Id.* at 374 (rejecting plan administrator's argument that new evidence could support the adverse benefit determination, when it "continually has asserted that the decision embodied in the denial letter . . . constituted its final decision regarding [participant's] entitlement to benefits").

## V. CONCLUSION

For the reasons above, Defendants' Motions for Judgment on the Administrative Record (ECF Nos. 45, 47 (redacted), and 49 (sealed)) are **DENIED**. Mr. Stover is entitled to Plan benefits for medical expenses resulting from his March 27, 2021 injury. The Clerk is **DIRECTED** to enter judgment in favor of Mr. Stover.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**